RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0199p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 15-1279

DETROIT MEDICAL CENTER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:05-cv-71722—Arthur J. Tarnow, District Judge.

Argued: June 15, 2016

Decided and Filed: August 17, 2016

BEFORE: BATCHELDER, GIBBONS, and SUTTON, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Thomas D. Sykes, GOULD & RATNER LLP, Chicago, Illinois, for Appellant. Deborah K. Snyder, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Thomas D. Sykes, GOULD & RATNER LLP, Chicago, Illinois, for Appellant. Deborah K. Snyder, Gilbert S. Rothenberg, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. Detroit Medical Center is made up of a collection of not-for-profit hospitals incorporated under Michigan law. The Center overpaid its taxes, entitling it to a refund plus interest. Under the Internal Revenue Code, "corporations" receive lower interest

1

rates on such refunds (the federal short-term interest rate plus as little as 0.5%) than other taxpayers (the federal short-term interest rate plus 3%). 26 U.S.C. § 6621(a)(1). The Center claims that, as a not-for-profit corporation, it should not be treated as a corporation and thus should be eligible for the higher interest rate—increasing its refund by $9.1 million. The Internal Revenue Service disagreed. And so did the district court. Because a nonprofit entity incorporated under state law amounts to a corporation, *see Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819), and because the Code contains no indication to the contrary, we must affirm the district court.

I.

The parties have been here before. In the first round, the Detroit Medical Center disclaimed any duty to pay FICA taxes (short for Federal Insurance Contributions Act taxes, which fund Social Security and Medicare benefits) on the stipends paid to its medical residents. We remanded the case to the district court to determine whether the residents amounted to "students" under the Center's residency program, making them eligible for the student exemption from the FICA tax obligation. *United States v. Detroit Med. Ctr.*, 557 F.3d 412 (6th Cir. 2009). In 2010, before the district court had a chance to resolve the issue, the IRS issued an administrative ruling that medical residents were students, exempting them (and their employers) from FICA taxes for tax periods prior to April 1, 2005. In the aftermath of this ruling, the Center and the IRS settled the dispute. Or so it seemed.

The IRS agreed to issue refunds to the Center for 1995–1997, 2001–2004, and the first quarter of 2005. For each of those twenty-nine taxable quarters, the IRS sent two checks to the Center: one for the employer portion of the FICA tax, the other for the employee portion of the FICA tax. The checks consisted of tax refunds and interest set by § 6621(a)(1). The IRS paid interest on the employee (the resident) portion of the FICA refunds at the rate for non-corporations: the federal short-term interest rate plus 3%. The IRS paid interest on the employer (the Medical Center) portion of the FICA refunds at the rate set for corporations: the federal short-term interest rate plus 2% for the first $10,000, then the short-term rate plus 0.5% on the portion of each refund above $10,000.

After it received the refund checks, the Center filed a motion to reinstate the case, seeking $9.1 million in additional interest on the employer portion refunds. Even though it was incorporated under Michigan law, it maintained that it should not be regarded as a "corporation" under § 6621(a)(1). The district court granted the United States' motion for summary judgment, concluding that the lower corporate interest rate on overpayment in § 6621(a)(1)(B) applied to tax refunds owed to for-profit *and* not-for-profit corporations. The Center appeals.

II.

In construing legislation, courts begin with the language of the statute. That approach, quite rightly, confirms the centrality of text to statutory interpretation. But it also explains why some statutory-interpretation opinions have difficulty holding the interest (and the comprehension) of the reader. To respect the first imperative sometimes creates tension with the second.

Consider our task today. The question at hand sounds simple enough: Should a nonprofit corporation be treated like a for-profit corporation when it comes to the interest it receives on overpaid taxes? Now consider the question in the context of the Internal Revenue Code:

**(a) General rule**

    **(1) Overpayment rate**

    The overpayment rate established under this section shall be the sum of—
    **(A)** the Federal short-term rate determined under subsection (b), plus
    **(B)** 3 percentage points (2 percentage points in the case of a corporation).

    To the extent that an overpayment of tax by a corporation for any taxable period (as defined in subsection (c)(3), applied by substituting "overpayment" for "underpayment") exceeds $10,000, subparagraph (B) shall be applied by substituting "0.5 percentage point" for "2 percentage points."

    **(2) Underpayment rate**

    The underpayment rate established under this section shall be the sum of—

    **(A)** the Federal short-term rate determined under subsection (b), plus
    **(B)** 3 percentage points.

. . .

**(c) Increase in underpayment rate for large corporate underpayments**

### (1) In general

For purposes of determining the amount of interest payable under section 6601 on any large corporate underpayment for periods after the applicable date, paragraph (2) of subsection (a) shall be applied by substituting "5 percentage points" for "3 percentage points".

. . .

### (3) Large corporate underpayment

For purposes of this subsection—

#### (A) In general

The term "large corporate underpayment" means any underpayment of a tax by a C corporation for any taxable period if the amount of such underpayment for such period exceeds $100,000.

#### (B) Taxable period

For purposes of subparagraph (A), the term "taxable period" means—

**(i)** in the case of any tax imposed by subtitle A, the taxable year, or
**(ii)** in the case of any other tax, the period to which the underpayment relates.

26 U.S.C. § 6621.

What starts as a basic question gets less basic the more one reads. Yes, this is a tax case. Some complexities—different rules for overpayments and underpayments, different interest rates for different taxpayers, some exceptions to some rules—come with the territory. But the first sign that the author of this provision was not thinking of his readers appears in the parenthetical of the flush paragraph: "To the extent that an overpayment of tax by a corporation for any taxable period (as defined in subsection (c)(3), applied by substituting 'overpayment' for 'underpayment') exceeds $10,000, subparagraph (B) shall be applied by substituting '0.5 percentage point' for '2 percentage points.'" The meaning of this exception turns on a cross reference to another subsection that applies to the opposite form of payment mentioned in the first subsection but only for "C corporation[s]," not "corporations" in general. 26 U.S.C. § 6621(c)(3)(A).

At the risk of creating undue suspense, we'll start by ignoring the exception. In other words, we'll consider how the tax overpayment rules in general apply to Detroit Medical Center, and after that we'll consider whether the exception alters that conclusion.

Here, to repeat, is the general rule from § 6621:

**(a) General rule**
**(1) Overpayment rate**

The overpayment rate established under this section shall be the sum of—
> **(A)** the Federal short-term rate determined under subsection (b), plus
> **(B)** 3 percentage points (2 percentage points in the case of a corporation).

The statute creates a dichotomy between overpayments by "a corporation" and by all other taxpayers, with corporations receiving a lower interest rate on their overpayments than everyone else. Incorporated under Michigan law, the Detroit Medical Center is by every relevant measure a corporation, meaning it receives the lower interest rate.

The first way of measuring this conclusion is not as helpful as one might hope. Since 1918, the Code has included a definition of "corporation." 26 U.S.C. § 7701(a)(3). But that definition offers a false peak. It says only that the term "includes associations, joint-stock companies, and insurance companies." The Center of course is not an association, joint-stock company, or insurance company. But because the word "includes" is a term of inclusion, not exclusion, that does not prevent the Center from being a corporation under the Code in general or under § 6621 in particular. *See* 26 U.S.C. § 7701(c).

In the absence of any statutory definition to the contrary, courts assume that Congress adopts the customary meaning of the terms it uses. *Morissette v. United States*, 342 U.S. 246, 263 (1952). For centuries, courts have permitted charitable organizations to be treated as corporations. *See* Edmund Seymour, *The Historical Development of the Common Law Conception of the Corporation*, 51 Am. L. Reg. 529 (1903). So firm is the foundation on which this principle rests that Chief Justice Marshall's invocation of it in *Dartmouth College*— permitting a college to be treated as a corporation—might have been called cliché in 1819. Two centuries earlier, in 1612, Sir Edward Coke wrote that a charitable hospital and school founded at the London Charterhouse was as valid a corporation as any other because it possessed all the

characteristics that are of the essence of a corporation. *The Case of Sutton's Hospital*, 77 Eng. Rep. 937 (1612), *in* 1 *Selected Writings of Sir Edward Coke*, vol. 1, 347, 363, 377 (Steve Sheppard ed., Liberty Fund 2003). In 1753, William Blackstone described charitable or "eleemosynary" corporations as one of the three basic kinds of corporations (the others he called "ecclesiastical" and "civil") and explained that "[e]leemosynary corporations are chiefly hospitals, or colleges in the universities." 1 William Blackstone, *Commentaries* *482.

By 1819, no one could be surprised that Chief Justice Marshall's definition of "corporation" would cover nonprofit institutions such as Dartmouth College: "an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence." *Dartmouth College*, 17 U.S. at 636. By 1833, Justice Joseph Story was piling on when he wrote that charitable corporations may take the corporate form to the same degree as for-profit, commercial corporations:

> It is wholly immaterial, in such cases, whether the corporation take for their own private benefit, or for the benefit of other persons. . . . A charter to a bank, or insurance, or turnpike company, is certainly a contract, founded in a valuable consideration. But it is not more so, than a charter incorporating persons for the erection and support of a hospital for the aged, the sick, or the infirm, which is to be supported by private contributions, or is founded upon private charity.

3 Joseph Story, *Commentaries on the Constitution* § 1386 (1833). Because the common law understanding of "corporation" has consistently included nonprofit corporations like Detroit Medical Center, it is fair to infer that the Internal Revenue Code uses the term in that same sense in § 6621.

New and old dictionary definitions of corporation come to the same place. One dictionary after another defines "corporation" in a way that includes nonprofit entities. The *Oxford English Dictionary* is one: "A body corporate legally authorized to act as a single individual; an artificial person created by royal charter, prescription, or act of the legislature, and having authority to preserve certain rights in perpetual succession." *Oxford English Dictionary* (2d ed. online version 2016). *Webster's Second International* is another: "A body politic or corporate formed and authorized by law to act as a single person, and endowed by law with the

capacity of succession. . . .  The definition most commonly accepted by judicial decision in the United States is that of the Dartmouth College Case. . . .  Lay corporations may be: eleemosynary corporations, those created for charitable purposes; and civil corporations, those formed for temporal purposes, and comprising public or municipal, corporations." *Webster's New International Dictionary* 596 (2d ed. 1934).  And *Black's Law Dictionary* is still another, whether one looks to an older definition:  "An artificial person or legal entity created by or under the authority of the laws of a state or a nation . . . ordinarily consisting of an association of numerous individuals, who subsist as a body politic under a special denomination, which is regarded in law as having a personality and existence distinct from that of its several members." *Black's Law Dictionary* (2d ed. 1910).  Or to a newer one:  "a group or succession of persons established in accordance with legal rules into a legal or juristic person that has a legal personality distinct from the natural persons who make it up, exists indefinitely apart from them, and has the legal powers that its constitution gives it."  *Black's Law Dictionary* 415 (10th ed. 2014).

Proof that Congress used the generic definition of "corporation" in § 6621—applicable to for-profit and not-for-profit entities alike—appears throughout the Internal Revenue Code. Consider three basic types of corporations addressed in the Code:  nonprofit corporations covered by subchapter F; certain for-profit corporations covered by subchapter C; and certain for-profit corporations covered by subchapter S.  In all three places, the drafters of the Code called these distinct entities "corporations."  Even everyday shorthand references to the three entities do not remove the term, as lawyers (and judges) customarily refer to them as § 501(c)(3) corporations, S corporations, and C corporations.

Section 501 is illustrative.  It addresses nonprofit entities that are generally exempt from federal income tax and that the Code still refers to as "corporations," assuming that, like the Detroit Medical Center, they are chartered in that way.  The title of 26 U.S.C. § 501 refers to an "[e]xemption from tax on corporations, certain trusts, etc."  The word "corporation" is used approximately fifty times throughout § 501.  More than a dozen different categories of nonprofit "corporations" are listed as exempt under § 501(c), including the first three "exempt organizations":  § 501(c)(1) ("Any corporation organized under Act of Congress"); § 501(c)(2)

("Corporations organized for the exclusive purpose of holding title to property"); and § 501(c)(3) ("Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes"). The drafters of the Code had no problem using the word "corporation" to refer to § 501(c)(3) entities like the Medical Center, among many other nonprofit corporations, making it fair to infer they meant to give the same word the same meaning in § 6621.

So too in other parts of the Code. Section 1381(a)(2)(A) says that the rules governing the tax treatment of cooperatives apply to "any corporation operating on a cooperative basis other than an organization . . . which is exempt from tax under this chapter." In the absence of that carve-out for tax-exempt corporations, such entities would have been included within the meaning of "corporation." Section 2522(b)(2) creates a tax deduction for gifts to "a domestic corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes." The word "corporation," as this section shows, often covers nonprofits. In § 1(h)(11)(B)(ii)(I), which addresses income tax, there is a carve-out for dividends taxed as net capital gain: "any dividend from a corporation which for the taxable year of the corporation in which the distribution is made, or the preceding taxable year, is a corporation exempt from tax under section 501 or 521." The section treats these nonprofit corporations as corporations, then specifically excludes them from coverage. Many other similar examples exist. *See, e.g.,* 26 U.S.C. § 12(1); 26 U.S.C. § 3121(h)(5); 26 U.S.C. § 2522(b)(2); 26 U.S.C. § 1504(b)(1).

*O'Neil v. United States*, 410 F.2d 888 (6th Cir. 1969), bolsters this conclusion. We held that "a corporation created under state law is a corporation within the meaning of" the Code. *Id.* at 899. Any doubt about our conviction on this score was removed when we referred elsewhere to state law incorporations as the "definitional lodestar" of a corporation under the Code. *Id.* at 895. The Detroit Medical Center, as it acknowledges, is a state law corporation. Yes, the precise question at hand in *O'Neil* was whether a for-profit business incorporated under state law amounted to a corporation. But it's not just the above statements that preclude us from limiting the decision to for-profit entities; the court's reasoning turns on the generic definition. In saying that "all organizations bearing the label 'corporation' under state law" are "accorded that status for federal income tax purposes," the Court relied on Chief Justice Marshall's iconic definition

of corporation in *Dartmouth College*. *Id.* at 895. What was true for the nonprofit College is true for the nonprofit Medical Center. They are both corporations.

All of this puts the Detroit Medical Center at the bottom of a steep hill when it comes to showing that the term "corporation" in § 6621 of the Code refers only to for-profit corporations. Its key argument turns on the flush paragraph mentioned above and reprinted here:

> To the extent that an overpayment of tax by a corporation for any taxable period (as defined in subsection (c)(3), applied by substituting "overpayment" for "underpayment") exceeds $10,000, subparagraph (B) shall be applied by substituting "0.5 percentage point" for "2 percentage points."

As the Center sees it, the definitional parenthetical takes the reader to subsection (c)(3), and that subsection applies to tax payments by a "C corporation." Hence, concludes the Center, if a corporation makes a tax overpayment, the lower interest rate applies to the refund only if the entity is a C corporation—a type of for-profit corporation. In the Center's words, "the type of 'corporation' specified by (a)(1) is the type of corporation embedded in and specified by (c)(3): a 'C corporation.'" Appellant's Br. 14.

We disagree with this interpretation, innovative though it is. The key problem is that the parenthetical most naturally modifies "taxable period," not "corporation." The "as defined" phrase appears closest to "taxable period," suggesting that this is what it is defining. Of all the terms that precede the parenthetical, moreover, "taxable period" is the only one "defined" in subsection (c)(3). There is no definition of corporation in subsection (c)(3). Also undermining this proposal is the reality that the definition of "taxable period" in (c)(3) refers to the word "underpayment"—the term for which "overpayment" must be substituted under the exception. Subsection (c)(3)(B)(ii) then defines taxable period as, "in the case of any other tax, the period to which the underpayment relates." The parenthetical explains that, to get a definition of "taxable period" for the purposes of (a)(1)(B), the reader looks to its definition in (c)(3), "applied by substituting 'overpayment' for 'underpayment.'" That the definition of "taxable period" in (c)(3) includes the word "underpayment" shows that Congress sought to define "taxable period" by the cross-reference to (c)(3) in the flush language.

The definition of "taxable period" appears in subsection (c)(3)(B), it is true, and the parenthetical cross-reference refers to subsection "(c)(3)." But this kind of imprecision is not unheard of in the Internal Revenue Code. Look no further than this section. Section 6621(c)(1) says: "For purposes of determining the amount of interest payable under section 6601 on any large corporate underpayment for periods after the applicable date, *paragraph (2)* of subsection (a) shall be applied by substituting '5 percentage points' for '3 percentage points,'" (emphasis added). If we should expect Congress to mention the most precise subsection in each cross-reference, it should have mentioned § 6621(a)(2)(B), which mentions "3 percentage points," not all of § 6621(a)(2), which does several additional things. *See also, e.g.*, 26 U.S.C. § 42(k)(2)(A) (referring to "a qualified nonprofit organization (as defined in subsection (h)(5))," even though subsection (h)(5)(c) defines "qualified nonprofit organization").

If the parenthetical phrase defines all of the preceding phrase, taking in "overpayment of tax by a corporation" and "taxable period" by way of (c)(3), another problem arises. Presumably the definition in (c)(3) that would cover "overpayment of tax by a corporation" is "large corporate underpayment," the only other term defined in (c)(3). The definition of "large corporate underpayment" in (c)(3), however, is a two-part definition, applicable to an underpayment made by a C corporation for more than $100,000. If "overpayment of a tax by a corporation" means the same thing as "large corporate underpayment" in (c)(3) (substituting overpayment for underpayment) then the overpayment would have to be (1) made by a C corporation, and (2) for more than $100,000. But Congress in § 6621(a) chose to say that a corporate overpayment would be in excess of $10,000. In other words: If the (c)(3) definition of "large corporate underpayment" returns to (a)(1), that means the statute says: "To the extent that an overpayment of tax by a C corporation over $100,000 for any taxable period exceeds $10,000 . . . ." Because $100,000 always exceeds $10,000, that would make the dependent clause of the flush language in (a)(1) a needlessly confusing appendage. Congress deserves more credit than that.

Nor is the Medical Center correct that the default meaning of "corporation" is C corporation throughout the Internal Revenue Code. Appellant's Br. 31. For one, the general definition of corporation covers nonprofit corporations, going back to *Dartmouth College* and

beyond.  For another, that approach does not work.  If Congress generally intends unadorned references to "corporations" to be read as meaning "C corporations," the first reference to "corporation" in § 6621(a)(1)(B) would naturally be read to refer to a "C corporation."  But Congress later referred to "C corporations" in (c)(3), rendering the "C" superfluous, something we try to avoid.  What, moreover, would happen to S corporations and their overpayments and underpayments?  The Center offers no answer.  The better inference is this:  "Where Congress includes particular language in one section of a statute"—for example C corporation—"but omits it in another section of the same Act"—for example corporation—"it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983).

The Medical Center persists that the Internal Revenue Code's definition of "S corporation" shows that the word corporation by itself generally refers to a C corporation.  In a section entitled "S Corporation defined," the Code says two things:  (1) that an S corporation means "a small business corporation" that has made an S corporation election under § 1362(a) for that year; and (2) a C corporation means "a corporation which is not an S corporation" for that year.  26 U.S.C. § 1361(a).  This definition, says the Center, proves that all corporations are C corporations unless they are S corporations.  But this argument is the epitome of a false dichotomy.  It may be that, in the world of for-profit corporations, an entity is either an S corporation or a C corporation.  But that does not mean that everything that is not an S corporation—such as a § 501(c)(3) corporation—is a C corporation.

Nor does the like-manner canon, formally known as the *in pari materia* canon, help Detroit Medical Center.  In English, the canon says that words dealing with the same matter in the same statute should be given the same meaning.  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260 (1993).  The Center inverts the canon in invoking it here.  It asks us to treat the same matters throughout the Internal Revenue Code differently and different matters within one section the same.  It implores us to treat the use of the word "corporation" in § 6621(a)(1) differently from uses of the same word in other sections of the Internal Revenue Code, such as § 501(c)(3).  And it implores us to treat the use of the generic word "corporation" in § 6621(a)(1) the same as the specific term "C corporation" in § 6621(c)(3).  The canon in truth leads to the opposite

conclusion: that the word "corporation," standing alone, and the word "corporation," preceded by the qualifier "C," should be given different meanings.

In claiming that the parenthetical cross-reference provides definitions for both "corporation" and "taxable period," the Center is half right. Subsection (c)(3) defines two phrases: "large corporate underpayment" and "taxable period." But it does not define "corporation." And one would not expect to find the definition of "corporation" in the definition of "large corporate underpayment," as the definition of a genus usually does not appear in the definition of the species.

No doubt, it is strange that Congress reduced the interest rate on overpayments for *all* corporations, whether for profit or not. We have considerable sympathy for the Medical Center on this score. Congress has created a regime in which a nonprofit hospital receives a lower interest rate on its FICA tax overpayments than Warren Buffett does on his individual tax returns. Perhaps Congress did not think about the point. Nonprofit corporations after all do not pay income tax, and most tax overpayment issues usually arise in the context of income taxes, as opposed to the automatic withdrawal regime associated with FICA taxes. And perhaps if Congress thinks about the point, it will alter the rule. But for now, we have a statute that by any conventional method of interpretation does not provide relief for the Detroit Medical Center. "Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding." *Lamie v. United States Tr.*, 540 U.S. 526, 538 (2004).

The Medical Center overreaches in purporting to identify another oddity. Under the government's position, it says, "only one type of entity enjoys the standard rate of interest on underpayments (subsection (c)) while simultaneously receiving a lower, non-standard (reduced) rate of interest on its overpayments (subsection (a)(1)): a charitable organization that happens to have been organized as a not-for-profit corporation." Appellant's Br. 39–40 (emphasis omitted). But the factual predicate of this claim is not true. An S corporation is in the same position. It would receive the standard rate (3%) for underpayments and the non-standard lower rate (2% and 0.5%) for overpayments as a "corporation." And a C corporation would be in the same position as well if its underpayment was less than $100,000. Some of the asymmetries in the provision by the way benefit nonprofit corporations. If a nonprofit corporation underpays its

taxes by more than $100,000, it would not be subject to the same higher interest rate of 5% as a C corporation.  It would just have to pay the standard 3%.

We take some comfort in the reality that the Second Circuit, in a thoughtful opinion by Judge Lynch, faced this same issue and reached the same conclusion.  *Maimonides Med. Ctr. v. United States*, 809 F.3d 85 (2d Cir. 2015).  In doing so, it made many points that by now ought to be familiar:  The word "corporation" "ordinarily refers to both for-profit and nonprofit entities," *id.* at 87; the key feature of the background definition is not whether the entity is a for-profit operation but whether state law has conferred corporate status on the entity, *id.* at 88; other uses of "corporation" throughout the Code include incorporated nonprofit organizations, *id.* at 88–89;  and "corporation" does not mean "C corporation" in § 6621(a)(1) because the cross-reference in that section defines "taxable period," not "corporation," *id.* at 91.  Agreed.

For these reasons, we affirm.